IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DMH INGREDIENTS, INC., | |
| Plaintiff, | |
| v. | Case No. 08 CV 4804 |
| LATITUDE, LTD. | Judge Holderman |
| Defendants. | Magistrate Judge Mason |
| LATITUDE, LTD. | |
| Third-party Plaintiff, | |
| v. | |
| UNITED FOODS CORP. | |
| Third-party Defendant. | |

## UNITED FOODS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### Introduction

Third Party Defendant United Foods Corporation ("United Foods") entered into a contract with Third Party Plaintiff Latitude, Ltd. ("Latitude") for the sale of 5,000 kg of ascorbic acid that specifically conditioned any claims of product purity or conformity on Latitude or any subsequent purchaser testing the product and advising United Foods within 14 days of receipt of any deficiencies. Both Latitude and Plaintiff DMH Ingredients, Inc. have admitted that they performed no testing of their own, and the only testing DMH's customer Golden Gate performed was done seven months after the sale, after Golden Gate had allegedly used the subject ascorbic acid in batches to make orange and lemon soda. Latitude agreed to the testing requirement in the contract.

Latitude's failure to timely test the product, or alternatively, to require its subsequent purchasers and/or end users to test the product for conformity, defeats Latitude's claims. Moreover, even if Latitude had found the product to be defective or non-conforming within the 14 day period, the contract limits United Foods' liability to the cost of the goods sold, in this case, $562.50. Accordingly, Latitude's claims are barred and United Foods is entitled to summary judgment as a matter of law.

## Facts

On or about March 3, 2005, Latitude ordered 5,000 kilograms of ascorbic acid from United Foods. On March 4, 2005, United Foods sent Latitude an order confirmation, identifying the ascorbic acid batch codes for the 5,000 kilogram shipment. Included in the shipment were batch codes 04065274, 04042028, 04042046 and 04042059. Latitude acknowledged receipt of United Foods' order confirmation on March 4, 2005. Latitude agreed to be bound by the terms and conditions of United Foods' order confirmation as the contract between the parties. (See United Foods Uncontested Statement of Facts in Support of Its Motion for Summary Judgment (hereinafter "United Foods' Statement of Facts"), ¶¶ 3-7). Paragraph 6 of the Terms and Conditions of the Sales Contract between United Foods and Latitude provides as follows:

> The Buyer (Latitude) shall, within fourteen (14) days from the date of receiving the shipment, inspect the goods against the specifications of the contract. In the case of a resale, the Buyer shall notify the enduser or the next buyer of the same requirement to have the goods tested or inspected against the contract specifications within 14 days upon receipt of the goods. In no event shall the Buyer allow the enduser or the next buyer to use the goods in manufacturing without testing or inspection. No liability shall be assumed or accepted by Seller (United Foods) if the Buyer fails to notify the enduser or next buyer of this requirement. If the Buyer rejects the goods shipped by the Seller upon receiving and testing by the enduser or the next buyer within 14 days of delivery or arrival at the destination stated in the Contract, the Buyer shall present to the Seller the results of testing or inspection showing deficiencies or non-conformities of the goods in the quality and packaging against the specifications, standards and testing methods stipulated in the Contract. The Seller shall accept the return of the goods and shall issue a full credit for the amount of the goods returned.

>If, however, the Buyer does not reject the goods within the aforementioned period, conformity and acceptance by the Buyer shall be presumptively presumed.

(United Foods Statement of Facts, ¶8).

Paragraph 9 of the Terms and Conditions of the Sales Contract between United Foods and Latitude provides as follows:

>WARRANTY: The Seller warrants to the Buyer that the goods delivered under this contract conform to the specifications for such goods as stated on the front page of this contract. No other warranty of product specifications is implied or intended in this contract unless noted on the front page hereof and made a part thereof. The Seller's warranty is limited to replacement or credit, at the Seller's option, for any new goods that are not conforming to said specifications. THIS WARRANTY SHALL BE IN LIEU OF ALL OTHER WARRANTIES, EXPRESS, STATUTORY OR IMPLIED, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE AND OF ALL OTHER OBLIGATIONS OR LIABILITIES OF THE SELLER. In no event shall the Seller be liable for special or consequential damages for failure to perform any obligation undertaken or imposed pursuant to this contract. No claim concerning the quality of dispatched goods shall give the Buyer the right to cancel this contract automatically, in whole or in part, so long as the Seller replaces, within a reasonable time, any goods Seller acknowledges to be non-conforming.

(United Foods Statement of Facts, ¶ 10).

Latitude arranged for the ascorbic acid to be picked up at United Foods' warehouse and had it shipped to DMH Ingredients on or about March 7, 2005. DMH shipped 330 lbs. of ascorbic acid lot no. 04042059 to its customer, Golden Gate Beverages Company, Inc. According to documents produced by Plaintiff DMH Ingredients, Inc., DMH's customer, Golden Gate Beverage Company, Inc., included ascorbic acid from batch no. 04042059 to make Lemon and Orange soda on October 12, 2005, more than 7 months after the product left United Foods' possession. (United Foods Statement of Facts, ¶12).

DMH admits that the first testing of Lot No. 04042059 for purity and/or conformity was done November 21-29, 2005, in Japan by Japan Food Research Laboratories. (United Foods Statement of Facts, ¶ 13). Latitude did not notify United Foods of any deficiencies or defects with the ascorbic

acid that United Foods sold to Latitude until after November 2005, more than 8 months after the contractual notice period expired. (United Foods Statement of Facts, ¶14).

### Argument

Under Fed. R. Civ. P. 56(c), summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The non-movant must identify specific facts that raise more than a "scintilla" of evidence in order to defeat a motion for summary judgment. *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998). Furthermore, the non-movant cannot merely rely on the content of the pleadings, but must identify specific facts to support its contention that there is a triable issue of material fact. *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1320 (7th Cir. 1993). The court views the record and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *See* FED. R. CIV. P. 56(c).

1. **The Parties Agreed That Latitude Could Only Recover For A Claim That The Product Did Not Meet Specifications If Latitude Or Its End User Tested The Product Within 14 Days Of Receipt.**

Here, the contract entered into between United Foods and Latitude clearly and unambiguously conditioned Latitude's claim that the product it purchased was not ascorbic acid on a showing that, within 14 days of receipt, the product was properly tested or otherwise inspected and found to be deficient. (United Foods Statement of Facts, ¶¶ 6-8). When parties dealing at arm's-length enter into a contract, the law allows them, within reasonable limits, to shape the terms of that contract as they please. *Album Graphics, Inc. v. Beatrice Foods Co.*, 87 Ill. App. 3d 338, 349, 408 N.E.2d 1041, 1050 (1980). Both the State and Federal constitutions guarantee freedom of contract and therefore, courts preserve the rights of the parties arising by agreement where the contract has

been freely entered into. *Jackson v. First National Bank of Lake Forest*, 415 Ill. 453, 459, 114 N.E.2d 721, 725 (1953).

The parties clearly intended to shift the risk of loss for non-conforming goods to Latitude once the goods were in Latitude's possession. Section 2-719 of the UCC has been interpreted by courts as intending to encourage and facilitate consensual allocations of risks associated with the sale of goods. *Gates Rubber Co. v. USM Corp.,* 508 F.2d 603, 616-17 (7th Cir. 1975). In *Gates*, the court applied this principle and stated that there was no reason, at least none based in Illinois law, not to give effect to the parties' intent to shift the risk of loss. *Id*. Also, in *Smith v Navistar Intern. Transp. Corp.*, the Court of Appeals held that where parties of relatively equal bargaining power negotiated an allocation of their risks of loss and where consequential damages were assigned to the buyer, the seller could not be required to absorb losses the buyer plainly agreed to bear even if the seller is unable to perform its obligations under the contract. 957 F.2d 1439, 1444 (7th Cir. 1992).

Latitude acknowledged and agreed to the terms of the contract. In doing so, Latitude agreed that it would bear the risk that the goods were non-conforming or otherwise deficient if it failed to test the goods, or to require the end user, Golden Gate, to do so within the allotted 14 day period. United Foods received the certificate of analysis from the manufacturer, Weisheng, and provided it to Latitude, as was required in the contract. The parties both understood that the substance in question was ascorbic acid. Under the terms of the contract, Latitude further understood that it was accepting the goods with the requirement that Latitude or its end user would be required to test the goods within 14 days of receipt to insure that they met the manufacturer's specifications. (United Foods Statement of Facts, ¶¶ 6-8).

By shifting the obligation to test the product to Latitude or its subsequent purchaser, the parties contemplated and understood that United Foods was able to charge a lower price for the

ascorbic acid. Latitude understood and agreed that if it failed to have the product tested, or to have its enduser test to insure it met the specifications of the contract, then United Foods would have no liability for any deficiencies in the product. Latitude has admitted that it failed to have to goods tested and failed to have its end user test the goods within the specified time period. Accordingly, the contract makes clear that Latitude's claims for indemnity, breach of warranty and breach of contract are all barred.

The contract's testing requirement limits Latitude's recovery, not just for its warranty and contract claims, but also for any tort claims. Illinois courts permit parties to contract away their potential tort liability. *Gates Rubber Co. v. USM Corp.*, 508 F.2d 603 (7th Cir.1975). In *Gates*, the parties had included a paragraph limiting recovery on warranty claims and a second, separate paragraph limiting recovery for "any special indirect or consequential damages". *Gates*, 508 F.2d at 616-17. The court held that the second general limitation paragraph would be robbed of its meaning if it were construed as limiting only warranty, or contract, claims and that it must therefore be construed as limiting liability for damages "that might be sought in suits based on theories other than breach of warranty." *Id*. at 617. The contract between United Foods and Latitude specifically bars any recovery for special or consequential damages. (United Foods' Statement of Facts, ¶9).

Additionally, Illinois authorities do not require a specific reference to either "negligence" or "fault" in order to limit negligence liability under a contract. *Id*. at 616. The court will simply look to see whether the parties intended their contract to limit the potential for recovery in tort and will read a general limitation on damages, if consistent with the terms of the contract, as limiting all potential liability other than that provided for in the contract. *Id.; Arkwright Mut. Ins. Co. v. Garrett & West, Inc.*, 790 F.Supp. 1386, 1389-90 (N.D.Ill.,1992). Here, the parties clearly intended that Latitude's sole form of remedy would be the cost to replace any defective or non-conforming

products that were tested and reported to United Foods within 14 days of receipt by Latitude or Latitude's subsequent purchaser.

## 2.     **Latitude Failed To Provide United Foods With An Opportunity To Cure.**

Furthermore, even if the contract entered into between the parties had not contained a provision requiring testing and notice of any defect within 14 days of receipt of the goods by Latitude or Latitude's subsequent purchaser, notice and an opportunity to cure are required independently under Illinois law. *Maldonado v. Creative Woodworking Concepts, Inc*. 296 Ill. App. 3d 935, 939-940, 694 N.E.2d 1021,1025-26 (1998). Section 2-607(3)(a)of the Illinois Uniform Commercial Code imposes a duty upon every buyer who has accepted goods to give notice of an alleged breach of any implied or express warranty to his seller within a reasonable time after he discovers, or should have discovered, the breach lest his claim be barred from any remedy. 810 ILCS 5/2-607(3)(a) (West 1996); *Wagmeister v. A.H. Robins Co.,* 64 Ill. App. 3d 964, 382 N.E.2d 23 (1978). The purpose of this notice requirement is to provide a seller with an opportunity to cure a defect and minimize damages, protect his ability to investigate a breach and gather evidence, and to encourage negotiation and settlement. *Maldonado,* 296 Ill. App. 3d at 939, 694 N.E.2d at 1026; *Perona v. Volkswagen of America, Inc.,* 292 Ill. App. 3d 59, 684 N.E.2d 859 (1997). In every action for breach of warranty, notice is an essential element and the failure to allege sufficient notice may be a fatal defect in a complaint alleging breach of warranty. *Maldanado,* 296 Ill. App. 3d at 939, 694 N.E.2d at 1026. Additionally, Section 2-607(3)(a) applies to all the various beneficiaries of an express or implied warranty in addition to the purchaser of the goods. *Id*.

Here, Latitude or its successors in interest should have known about any actual defect in the product or any other failure to meet the specifications before the product was added to the

7

soft drink mixtures and bottled. Golden Gate, as a processor of drinks intended for human consumption, was required to follow guidelines established by the U.S. Food and Drug Admnistration. For instance, processors are required to establish a Hazard Analysis and Critical Care Point (HACCP) system and "processors should evaluate product ingredients, processing procedures, packaging, storage, and intended use . . . to determine the potential effect of each on the safety of the finished food for the intended consumer." 21 C.F.R. § 120.7(d). Similarly, the FDA sets forth good manufacturing processes ("GMPs") that food and drink processors like Golden Gate are expected to follow. One such GMP provides, "Raw materials and other ingredients shall be inspected and segregated or otherwise handled as necessary to ascertain that they are clean and suitable for processing into food." 21 C.F.R. § 110.80(a). Golden Gate, the end user here, had the opportunity and the obligation to test the product it purchased from DMH to insure it met the standards set forth by the FDA. If Golden Gate had tested the product, and its testing revealed the same findings as alleged in the instant lawsuit, that the product was not ascorbic acid, DMH could have notified Latitude, which in turn could have notified United Foods and given United Foods an opportunity to cure the alleged defect.

**3.     The Maximum Latitude Can Recover Against United Foods Is The Cost Of The Ascorbic Acid.**

The warranty limits United Foods' exposure to the cost of the goods sold. Paragraph 9 of the contract clearly provides that the maximum Latitude can recover for non-conforming goods is the cost of the goods to Latitude. Here, DMH has brought an action against Latitude alleging only that the product DMH sold to Golden Gate is not ascorbic acid, but rather, erythorbic acid. DMH's documents show that it only sold 330 lbs (150 Kg) of product from Lot No. 04042059. Latitude paid $3.75 per Kg for the product, or a total of $562.50 for the ascorbic acid that is the subject of the claim. The sum total of the cost of that product to Latitude was $562.50, and pursuant to the

8

paragraph 9 of the contract between the parties, the maximum that United Foods could be liable to Latitude for is that amount, $562.50. Accordingly, even if United Foods is somehow found to be responsible for the allegedly non-conforming ascorbic acid, the maximum that Latitude can recover from United Foods is $562.50.

**Conclusion**

Latitude agreed to be bound by the terms of United Foods Order Confirmation. The Order Confirmation conditioned Latitude's ability to seek recovery for non-conforming goods on Latitude or the end user testing the product within 14 days of receipt, and timely reporting any deficiency to United Foods to provide United Foods with the opportunity to replace the non-conforming product. The UCC similarly requires that Latitude provide United Foods with an opportunity to cure any claimed defect in the products in a timely manner. Finally, even if United Foods could be found liable for Latitude's loss, the Order Confirmation specifically excludes special or consequential damages and limits any liability to the cost of the allegedly defective goods. Accordingly, United Foods is entitled to summary judgment in its favor and against Latitude.

Respectfully submitted,

By:   /s/ Christopher T. Sheean_____
One of the Attorneys for United Foods Corporation

Christopher T. Sheean, ARDC #6210018
Nicole M. Young-Kuykendall, ARDC #6294692
Swanson, Martin & Bell LLP
330 North Wabash Avenue, Suite 3300
Chicago, Illinois 60611
(312) 321-9100
Fax: (312) 321-0990
csheean@smbtrials.com
nkuykendall@smbtrials.com

9